UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

DAVID AGENJO,

             Plaintiff,

     -against-

CITY OF NEW YORK; POLICE OFFICER AMAURYS
TAVEREZ, SHIELD # 019400; POLICE OFFICER
MARTIRES PEREZ, SHIELD # 011767; POLICE
OFFICER JAYDEEN VEGA, SHIELD # 000189;
SERGEANT DIAZ, SHIELD #3186; JOHN DOE
OFFICERS #1-3

             Defendants.

----------------------------------------------------------------------- x

**COMPLAINT AND
JURY DEMAND**

**Docket No.**

    Plaintiff David Agenjo by his attorneys, Stoll, Glickman & Bellina, LLP, for his
complaint alleges as follows:

## PRELIMINARY STATEMENT

  1.  This is a civil rights action in which Plaintiff seeks relief through 42 U.S.C. § 1983 for
the violation of his First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

  2.  The claim arises from a November 2, 2013 incident in which New York City Police
Department ("NYPD") officers of the 42nd Precinct, acting under color of state law, falsely
arrested Mr. Agenjo, used excessive force against him, deprived him of his right to freedom of
speech, and made false allegations against him to the Bronx County District Attorney's Office.

  3.  Plaintiff seeks monetary damages (special, compensatory, and punitive) against
Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as
the Court deems just and proper.

## JURISDICTION & VENUE

4.     This action arises under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

5.     The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3)-(4), 1367(a), and the doctrine of pendent jurisdiction.

6.     Venue is laid within the Southern District of New York in that Defendant City of New York is located within the boundaries of the Southern District, and a substantial part of the events giving rise to the claim occurred in Bronx County.

## PARTIES

7.     Plaintiff DAVID AGENJO is a resident of Bronx County in New York State.

8.     The CITY OF NEW YORK ("City") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention, and conduct of all NYPD personnel.  In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

9.     Defendant Officers AMAURYS TAVAREZ, MARTIRES PEREZ, JAYDEEN VEGA, and Sergeant JOHNNY DIAZ were at all times here relevant police officers of the NYPD, and as such were acting in the capacities of agents, servants, and employees of the City of New York. On information and belief, at all times relevant hereto, defendant police officers were involved in the decision to arrest Plaintiff without probable cause or failed to intervene in the actions of their fellow officers when they observed them arresting Plaintiff without probable cause.  The police

2

officer defendants are sued in their individual capacities.

10.    Defendant JOHN DOE OFFICERS #1-3 were at all times here relevant police officers of the NYPD, and as such were acting in the capacities of agents, servants, and employees of the City of New York.   On information and belief, at all times relevant hereto, defendant police officers were involved in the decision to arrest Plaintiff without probable cause or failed to intervene in the actions of their fellow officers when they observed them arresting Plaintiff without probable cause.   The John Doe officer defendants are sued in their individual capacities.

11.    At all times here mentioned Defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## **FACTUAL ALLEGATIONS**

12.    In 2012, Mr. Agenjo resided at Louis Nine House ("LNH"), located at 1323 Louis Nine Boulevard in the Bronx.

13.    LNH is an apartment building for young adults who are homeless or aging out of foster care.

14.    On November 2, 2012, Mr. Agenjo's girlfriend, Brittany Smith, was visiting him at LNH.

15.    At approximately 3:00 P.M., Ms. Smith and Mr. Agenjo walked out of the building together and onto the sidewalk.

16.    Defendants Officer Vega and Sergeant Diaz approached Ms. Smith and Mr. Agenjo and issued a summons to Ms. Smith.

17.    While Officer Vega and Sergeant Diaz were issuing the summons, Defendants Tavarez and Perez arrived at the scene.

18.   Mr. Agenjo asked the officers why they were giving Ms. Smith a summons.

19.   Mr. Agenjo was standing still, with his arms by his side and his hands in his pockets.

20.   After Mr. Agenjo questioned the officers about the summons, Officer Tavarez aggressively approached Mr. Agenjo, causing Mr. Agenjo to step backwards in fear.

21.   Mr. Agenjo was not committing a crime, had not committed crime, and the officers did not have an arrest warrant.

22.   Officer Tavarez pushed Mr. Agenjo against a metal fence on the side of the road and placed him under arrest.

23.   Officer Tavarez forcefully jostled Mr. Agenjo, shoving him in the fence several times.

24.   Officer Perez, Officer Vega, and Sergeant Diaz assisted Officer Tavarez in pushing Mr. Agenjo against the fence, or failed to intervene in their fellow officers' obviously unlawful actions.

25.   The officers struck Mr. Agenjo in the back several times while he was pinned against the metal fence.

26.   Mr. Agenjo fell down in pain.  All four named defendant officers jumped on top of him, kneeling on his back and forcibly holding him down.

27.   While Mr. Agenjo was on the ground with the officers on top of him, Officer Vega discharged pepper-spray in Plaintiff's face.

28.   One of defendant officers took out his nightstick and struck Mr. Agenjo repeatedly in the left leg and ankle.

29.   Mr. Agenjo was handcuffed and brought to the 42nd Precinct, where he asked for medical attention.

30.   Despite the existence of visible injuries on Plaintiff's body and face, officers at the

42nd Precinct refused to call an ambulance or provide any medical attention.

31.    Mr. Agenjo was brought to Bronx Central Booking.

32.    Defendant officers misrepresented to the Bronx County District Attorney's Office that Plaintiff had committed the offenses of assault, resisting arrest, menacing, disorderly conduct, and harassment.

33.    Officer Tavarez, the deponent in the Criminal Complaint, falsely swore that he observed Mr. Agenjo "flailing his arms, pulling his arms away, twisting his body, stiffening his body, and grabbing a fence with his right hand, refusing to be handcuffed."

34.    On November 3, 2013, Mr. Agenjo was arraigned in Bronx County Criminal Court.

35.    Mr. Agenjo was charged with violations of N.Y. Penal Law ("P.L.") 120.00 (1) – Assault in the Third Degree; N.Y. P.L. 205.30 – Resisting Arrest; N.Y. P.L. 120.15 – Menacing; N.Y. P.L. 240.20 (1) – Disorderly Conduct; and N.Y. P.L. 240.26 (1) – Harassment in the Second Degree.

36.    The Honorable Megan Tallmer set bail at $2,500 bond over $1,500 cash.

37.    Because Mr. Agenjo was unable to afford the bail set by Judge Tallmer, he was sent to the custody of the Department of Correction ("DOC") and placed at the Vernon C. Bain Center. It was the first time Plaintiff had been incarcerated.

38.    Approximately one week later, Plaintiff was released from DOC custody.

39.    After his release, Plaintiff received medical treatment for pain throughout his body, including his knee, ankle, and back.

40.    On March 31, 2013, the Honorable Steven Hornstein of Bronx Criminal Court dismissed the Resisting Arrest and Disorderly Conduct charges as facially insufficient.

41.    After making approximately 28 court appearances, the remainder of the charges were

dismissed and sealed pursuant to N.Y. Criminal Procedure Law ("C.P.L.") 170.55.

42.   At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate Plaintiff's rights.  The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.  They failed to intervene in the obviously illegal actions of their fellow officers against Plaintiff.

43.   During all of the events above described, defendants acted maliciously and with intent to injure Plaintiff.

## DAMAGES

44.   As a direct and proximate result of the acts of defendants, Plaintiff suffered the following injuries and damages:

    a.   Violation of his rights pursuant to the First Amendment of the United States Constitution to freedom of speech;

    b.   Violation of his rights pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of their persons;

    c.   Violation of his rights pursuant to the Fourth, Fifth, and Sixth Amendments of the United States Constitution to a fair trial;

    d.   Violation of his rights pursuant to the Fourteenth Amendment of the United States Constitution to due process;

    e.   Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

    f.   Loss of liberty; and

    g.   Physical pain and suffering.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983
FALSE ARREST & DENIAL OF FREE SPEECH

45.    The above paragraphs are here incorporated by reference.

46.    The officer defendants wrongfully, unjustifiably, and illegally apprehended, arrested, detained, and imprisoned Plaintiff, and failed to intervene in each other's obviously illegal actions.

47.    The wrongful arrest was carried out without a valid warrant, without Plaintiff's consent, and without probable cause or reasonable suspicion.

48.    All of this occurred without any illegal conduct by Plaintiff.

49.    By arresting Plaintiff in retaliation for asking a question, Defendants' conduct deprived Plaintiff of his right to freedom of speech.

50.    Defendants' conduct deprived Plaintiff of his rights under the First, Fourth, and Fourteenth Amendment to the United States Constitution.  Defendants are liable to Plaintiff under 42 U.S.C. § 1983.

51.    Plaintiff has been damaged as a result of Defendants' wrongful acts.

## SECOND CAUSE OF ACTION
42 U.S.C. § 1983
USE OF EXCESSIVE FORCE

52.    The above paragraphs are here incorporated by reference.

53.    By pushing Plaintiff against a metal fence and striking him repeatedly, including with a nightstick, Defendants used excessive force against Plaintiff, and failed to intervene in each other's obviously illegal actions.

54.    Defendants' conduct deprived Plaintiff of his right to due process of law, pursuant to the Fourth and Fourteenth Amendment to the United States Constitution.  Defendants are liable

to Plaintiff under 42 U.S.C. § 1983.

55.   Plaintiff has been damaged as a result of Defendants' wrongful acts.

**THIRD CAUSE OF ACTION**
42 U.S.C. § 1983
DENIAL OF FAIR TRIAL

56.   The above paragraphs are here incorporated by reference.

57.   The individual defendants fabricated false evidence against Plaintiff and forwarded such false evidence to the Bronx County District Attorney's Office, and failed to intervene in each other's obviously illegal actions.

58.   Defendants were aware or should have been aware of the falsity of the information used to prosecute Plaintiff.

59.   As a result of Defendant's false statements, bail was set, Plaintiff was sent to Rikers Island, and Plaintiff fought false charges for more than two years.

60.   Defendants' conduct deprived Plaintiff of his right to a fair trial, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  Defendants are liable to Plaintiff under 42 U.S.C. § 1983.

61.   Plaintiff has been damaged as a result of Defendants' wrongful acts.

**FOURTH CAUSE OF ACTION**
42 U.S.C. § 1983
MUNICIPAL LIABILITY

62.   The above paragraphs are here incorporated by reference.

63.   The City is liable for the damages suffered by Plaintiff because, after learning of its employees' violations of New Yorkers' constitutional rights, the City has:  failed to remedy the wrong; created policies or customs under which unconstitutional practices regularly occur and even thrive; and has been grossly negligent in managing subordinates who cause the unlawful

events.  The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct. By failing to properly train, supervise, and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

64.    The City has been aware for some time – from civil rights lawsuits, Notices of Claim, complaints filed with the Civilian Complaint Review Board ("CCRB"), City Council hearings, newspaper reports, criminal cases resulting in declined prosecutions and dismissals, and judicial rulings suppressing evidence and finding officers incredible as a matter of law – that a disturbing number of NYPD officers unlawfully search and seize New Yorkers without probable cause, bring charges against New Yorkers with no legal basis, perjure themselves in charging instruments and through testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

65.    Despite having acquired such knowledge, the City has refused to appropriately sanction its employees' illegal behavior.

66.    The City's deliberate indifference to civil rights violations committed by individual police officers, as well as patterns of misconduct committed by the same officers or occurring in the same precinct has caused the constitutional violations against Plaintiff in this case.

**THE CITY FAILS TO TRACK CIVIL RIGHTS LAWSUITS, THEREBY SEVERING ANY POTENTIAL DETERRENT VALUE**

67.    For decades, the City has been on notice that certain officers and precincts are disproportionately responsibility for civil rights lawsuit liability.  Nonetheless, the City has failed to take action to hold officers or precincts accountable.

68.    In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was "a total disconnect" between the settlements of civil claims – even

substantial ones – and NYPD discipline of officers.[1]  Hevesi continued:

> As a result, the NYPD does not learn of potential problem officers, fails to take curative action, and not infrequently fosters a situation in which an officer will engage in another act of violation, resulting in harm to another person and further damages from the City. More important, study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action.[2]

69.    The Comptroller recommended that the police department "analyze . . . settled claims, and take steps to review the officers' performance and propensity to commit acts of excessive force."[3]

70.    The City has not heeded Hevesi's advice, and the "total disconnect" remains fully in place today.  The number of claims against the NYPD has doubled in recent years, costing taxpayers more than $1 billion.[4]

71.    Yet the City continues to resist attempts to catalog even the most basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and

---

[1] *Id.*

[2] *Id.*

[3] *Id.*

[4] *See* Barry Paddock, Rocco Parascandola, John Marzulli, & Dareh Gregorian, *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE (reporting that the number of claims against the NYPD doubled between 2004-2014, to a record high of 9,570 lawsuits filed in 2012, costing taxpayers nearly $1 billion); Colleen Long & Jennifer Peltz, Associated Press, *Nearly $1B in NYC police payouts*, Yahoo! News (October 14, 2010, 7:44 PM), http://news.yahoo.com/ap-investigation-nearly-1b-nyc-police-payouts.html (reporting that, in the decade ending in 2010, the City paid out nearly one billion dollars to resolve claims against the NYPD); Caroline Bankoff, *The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years*, NYMag.com, Oct. 12, 2014,  http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html   (reporting that, between 2009-2014, New York City paid out more nearly $500 million to settle NYPD-related cases); see also City of New York, Office of the Comptroller Claims Report FY 2012, 30, June 4, 2013, https://www.documentcloud.org/documents/1375759-fy-2012-claims-report.html (noting that, in fiscal year 2012, so-called "police action claims," which are claims that result from false arrest or imprisonment, police shootings, excessive use of force, assault, or failure to protect, cost the City $64.4 million, and that in fiscal year 2011, the City paid out $60.2 million in police action claims).

discipline in the NYPD.  Although certain police officers, units, and precincts have been found to have violated New Yorkers' constitutional rights *repeatedly*, the City refuses to track the data, or even to use the data it already has.[5]

72.    Courts – including this nation's highest court – assume that civil rights lawsuits deter police misconduct.  *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.") (citing *Carey v. Piphus*, 435 U.S. 247, 254-257 (1978)); *Hudson v. Michigan*, 547 U.S. 586, 598 (2006) ("As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts.") (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) and *Nix v. Williams,* 467 U.S. 431, 446, (1984)).

73.    However, because the City of New York refuses to track civil rights lawsuits, such suits do not serve the deterrent purpose envisioned by the Supreme Court.

74.    Civil rights lawsuits against NYPD officers have no impact on the officers' careers, regardless of the expense to the City to defend a police misconduct case, and even when the same officers are named in multiple lawsuits, because settlements of civil claims are ordinarily not even noted in an officer's personnel file.[6]

75.    By failing to keep track of crucial data – which could save lives as well as taxpayer money – the City has created a system in which lawsuits are severed from any potential deterrent

---

[5] *See, e.g.*, Barry Paddock, et al., *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014,  http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE  ("The [Daily] News' investigation was centered around the results of a Freedom of Information Law request for a list of lawsuits filed against officers who have been sued 10 or more times over the past decade. The city Law Department provided the names of 51 officers and 463 cases.  A News search found an additional 146 cases against the officers, and four other officers who should have been included in the response — calling into question the city's ability to track these cases.").

[6] Association of the Bar of the City of New York, Committee on New York City Affairs, "The Failure of Civil Damages Claims to Modify Police Practices, and Recommendations for Change,"  March 2000, *available at* http://www2.nycbar.org/Publications/reports/print_report.php?rid=32.

effect.

## THE CITY FAILS TO DISCIPLINE OFFICERS WHO COMMIT PERJURY AND FALSIFY OFFICIAL RECORDS

76.   The City is liable to Plaintiff for its failure to keep track of judicial decisions in suppression hearings where police officers have been found to have fabricated testimony.

77.   There are hundreds of published decisions from the past several years in which judges in New York City courtrooms determine that, as a matter of law, police officers have testified incredibly, conducted illegal searches and seizures, and even suborned perjury.

78.   Judicial decisions from suppression hearings and trials are particularly reliable indicators of a police officer's professional conduct and credibility because the testimony has been tested in open court, under oath.

79.   Yet those in a position of authority – such as NYPD supervisors and prosecutors – have no procedure to notify individual officers or their supervisors of adverse judicial findings.

80.   Without any notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for.

81.   This has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal.  As the Honorable Jack Weinstein, United States District Court Judge of the Eastern District of New York, has written:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and

other qualifications, serious training to avoid constitutional
violations, and strong disciplinary action within the department—
there is some evidence of an attitude among officers that is
sufficiently widespread to constitute a custom or policy by the city
approving illegal conduct of the kind now charged.

*Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009).

## THE CITY FAILS TO HOLD POLICE OFFICERS PERSONALLY FINANCIALLY LIABLE, RESULTING IN A COMPLETE LACK OF ACCOUNTABILITY

82.   The City of New York is also liable in this case because, by habitually indemnifying
police officers who have acted unconstitutionally, the City isolates such officers from
accountability.[7]   The effect – yet again – is that civil rights lawsuits do not serve a deterrent
purpose.   "It is almost axiomatic that the threat of damages has a deterrent effect, *surely
particularly so when the individual official faces personal financial liability*." *Carlson v. Green*,
446 U.S. 14, 21, (1980) [emphasis added] (citing *Imbler v. Pachtman*, 424 U.S. 409, 442 (1976))
[footnote omitted].

## THE CITY HAS FAILED TO CREATE A MEANINGFUL POLICE OVERSIGHT AGENCY, THUS ALLOWING OFFICERS' UNLAWFUL BEHAVIOR TO GO UNCHECKED

83.   The City is liable because it has created a legal system in which officer misconduct
routinely goes unpunished.

84.   The City has purported to attempt to address police officers' abuse of authority, in part
through the creation of the CCRB, a police oversight agency with investigative powers.

85.   However, the CCRB has proved vastly inadequate.

86.   First, the CCRB fails in its mission because it often has found that complainants "lack

---

[7] *See* Eric Jaffe, *When Cops Violate Civil Rights, It's City Taxpayers Who Pay*, CITYLAB, Dec. 4, 2014,
http://www.citylab.com/crime/2014/12/when-cops-violate-civil-rights-its-city-taxpayers-who-pay/383419/
(reporting that taxpayers almost always satisfy both compensatory and punitive damages awards entered against
police officers).

credibility" based on the fact that the complainant has also brought a civil rights lawsuit. The result is that the CCRB often fails to substantiate some of the most serious allegations.

87. Second, when the CCRB has determined that officers have made false statements to the CCRB in their own defense, the CCRB virtually never initiates its own findings against those dishonest officers. The same is true in situations where the CCRB finds that officers have failed to report their fellow officers' misconduct.

88. Third, because the CCRB's penalty recommendations are purely advisory and there is no enforcement mechanism, the recommendations have no binding effect on the NYPD or its officers. Even when the CCRB substantiates complaints, the police department rarely imparts its own discipline on the officer, and often simply drops the complaints.[8]

89. Fourth, the NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized. Furthermore, in the rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, a power the commissioner has wielded.

90. The complaint procedure provides seemingly countless opportunities for City agencies to dismiss or disregard legitimate, credible complaints.

91. Due to the failures of the CCRB, many abuses of authority by police officers go unreported. Officers are thus free to abuse their authority with little or no fear of repercussions.

92. Here, the lack of accountability contributed to the defendant police officers' actions

---

[8] *See* Nathan Tempey, *CCRB: Cop Who Shoved Kid Through Hookah Bar Window Used Excessive Force*, gothamist, July 28, 2015, http://gothamist.com/2015/07/28/bronx_hookah_window_ccrb.php (reporting that in 2014, the CCRB substantiated only 327 of nearly 5,000 complaints, and that the NYPD disciplined 10 2 officers in that same period. Of the officers disciplined, only 22 faced administrative charges); WNYC.org, *Police Punishment: CCRB vs NYPD*, http://project.wnyc.org/ccrb/ (last visited July 23, 2015) (reporting that, in 2012, police officers received no discipline in 104 cases (40.3%) of the substantiated complaints processed (258); in 2013, the NYPD dropped 28.3% of the substantiated complaints without any disciplinary action; in 2014, it dropped 24.5%).

described above in that the officer defendants knew they were insulated from any repercussions for their unlawful actions against Plaintiff.

## THE CITY HAS ENCOURAGED UNCONSTITUTIONAL STOPS THROUGH ITS USE OF ARREST QUOTAS

93.    The City has also been alerted to the regular use of "Stop, Question, and Frisk" by its police officers, which disproportionately target people of color, despite the humiliation, inconvenience, and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result.

94.    Even as the use of "Stop, Question, and Frisk" has declined precipitously in recent years – in large part due to the federal class action lawsuit *Floyd, et al. v. City of New York, et al.*, 08-CV-1034 (SAS) – the police have continued to use the policing tactic in a severely racially disproportionate manner, and for the improper purpose of meeting "performance goals" (more commonly known as arrest quotas).

95.    According to data collected by the New York Civil Liberties Union ("NYCLU"), in 2014, New Yorkers were stopped by the police 46,235 times.  Of the people stopped:  38,051 were totally innocent of any crime (82%); 24,777 were Black (55%); 12,662 were Latino (29%); and 5,536 were white (12%).[9]

96.    The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people.  For example, the NYCLU reported that more than 85% of summonses for Open Container were given to Black and Latino New Yorkers, whereas white recipients made up merely 4%.[10]   The grossly disproportionate issuance of

---

[9] *See* NYCLU, *Stop and Frisk Campaign: About the Issue*, http://www.nyclu.org/content/stop-and-frisk-data (last visited July 22, 2015).

[10] See NYCLU, *Testimony Before City Council Public Safety & Courts and Legal Services Committees On Summons Court Operations and Impact*, http://www.nyclu.org/content/testimony-city-council-public-safety-courts-and-legal-services-committees-summons-court-oper.

summonses to New Yorkers of color led one Kings County judge to note that he could not recall ever having arraigned a white defendant on an open container charge.[11]

97.   Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals," resulting in the violation of innocent New Yorker's civil rights.[12]

98.   The City's inability to prevent its officers from abusing the stop and frisk policy is emblematic of the City's continuing failures to exercise adequate control over the NYPD, and to prevent police officers from abusing their authority.  Such failures have led to further abuse of authority by police officers, including the incident underlying Plaintiff's Complaint.

**DEFENDANT OFFICERS' PRIOR LAWSUIT HISTORY**

99.   The City of New York knew or should have known of the defendant officers' propensity to engage in misconduct of the type alleged in this Complaint, specifically arresting New Yorkers without probable cause to believe they have committed a crime or engaged in any wrongdoing.

100. Specifically, the City of New York has been aware of numerous claims of constitutional violations involving Defendant Officer Amaurys Tavarez, as documented in the following civil rights actions filed against the City of New York and Officer Tavarez:

> a.  *Bailey v. City of New York, et al.*, 11-CV-4181 (KBF) (GWG) (Officer Tavarez alleged to have falsely arrested, used excessive force on, and made false allegation about a woman in the Bronx; case settled); and
>
> b.  *Israel v. City of New York, et al.*, 15-CV-1692 (GHW) (Officer Tavarez, working as a School Safety Officer, alleged to have attacked and arrested

---

[11] *People v. Figueroa*, 36 Misc.3d 605, 608 (Kings Co. 2012).

[12] *See* Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, WABC News ( (Mar. 2, 2010, 10:37 PM), http://7online.com/archive/7305356/ and Jim Hoffer, *Kelly Responds to Our NYPD Quotas,* WABC News (May 25, 2010, 3:31 PM), http://7online.com/archive/7461355/.

public school teacher without provocation or probable cause; pending).

101. Additionally, the City of New York has been aware of claims of constitutional violations involving Defendant Officer Jaydeen Vega, as documented in the following civil rights action filed against the City of New York and Officer Vega:

    a. *Daniels v. City of New York, et al.*, 07-CV-11600 (CM) (Officer Vega alleged to have falsely arrested and pepper-sprayed a woman standing on the street in the Bronx; case settled).

102. Upon information and belief, the City failed to impose any sanctions or punishment on Defendants as a result of these prior lawsuits, resulting in a total lack of accountability and instilling a belief in Defendants that there are no consequences for violating the civil rights of the people they are supposed to protect. That belief contributed to Defendant's conduct towards Plaintiff in the instant case.

103. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights. Despite such notice, the City has failed to take corrective action. This failure and these policies caused the officers in the present case to violate Plaintiff's civil rights, without fear of reprisal.

104. Plaintiff has been damaged as a result of the City's deliberate indifference.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, as follows:

A. In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B. Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C. Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

      D.      Granting such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.


DATED:       September 21, 2015
               Brooklyn, New York


                                        Respectfully submitted,


TO:    City of New York             STOLL, GLICKMAN & BELLINA, LLP
        100 Church Street
        New York, NY 10007

                               Amy E. Robinson, Esq.
        Officer Amaurys Tavarez # 019400    475 Atlantic Ave, 3rd floor
        Manhattan Bronx School Safety      Brooklyn, NY  11217
         Division                   (718) 852-3710
        1 Randall's Island              arobinson@stollglickman.com
        New York, NY 10035

        Officer Martires Perez # 011767     *Attorneys for Plaintiff*
        42nd Precinct
        830 Washington Avenue
        Bronx, NY 10451 4604

        Officer Jaydeen Vega # 000189

        Sergeant Johnny Diaz # 3186
        Patrol Bureau Bronx Precinct
        450 Cross Bronx Expressway
        Bronx, NY 10457